## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**MITCHELL FELDMAN, et al.**

      **Plaintiffs,**

**v.**                                                   **Case No. 8:14-cv-1637-T-30EAJ**

**IMPERIUM INSURANCE COMPANY,**

      **Defendant.**

_____/

## <u>ORDER</u>

THIS CAUSE comes before the Court upon: (1) Defendant Imperium Insurance Company's Motion for Summary Judgment (Dkt. 27), Plaintiffs' response in opposition (Dkt. 33), Defendant's reply (Dkt. 41), Plaintiffs' sur-reply (Dkt. 44); and (2) Plaintiffs' Motion for Partial Summary Judgment (Dkt. 28) and Defendant's response in opposition (Dkt. 31). The Court, having reviewed the motions, responses, replies, and record, and being otherwise advised of the premises, concludes that Defendant's motion should be denied and Plaintiffs' motion should be granted.

### *Background*

Plaintiffs Mitchell Feldman and Feldman Morgado, PA (collectively, "Plaintiffs") allege that their professional liability insurer, Defendant Imperium Insurance Company ("Imperium"), wrongfully refused to defend and indemnify Plaintiffs in a state-court malpractice action. (Dkt. 2). Imperium maintains that Plaintiffs knew of the potential for

a malpractice claim prior to the policy's effective date, triggering the policy's prior-knowledge exclusion.  The relevant facts follow.

Imperium issued a professional liability policy to Feldman Morgado P.A. ("the law firm") as the named insured, with a limit of liability of $1,000,000.00 per claim and in the aggregate. (Dkt. 27-7 at 11).  The policy covered other insureds, including Mitchell Feldman ("Feldman"), a partner at the law firm, and Jonathan Gilbert ("Gilbert"), an associate at the law firm.[1]  (*Id*. at 15).  The effective dates were December 20, 2012, to December 20, 2013. (*Id*. at 11).  The policy was a claims-made and reported policy, providing coverage for claims first made while the policy was in force and reported no later than 60 days after the termination of the policy.  The policy also provided that coverage was limited to covered acts committed after the applicable retroactive date.  (*Id*.).  The applicable retroactive date for Feldman was December 21, 2009, and the applicable retroactive date for Gilbert was April 12, 2010.  (*Id*. at 15).

### The malpractice action

On April 12, 2013, while the policy was in effect, Chad Ketchum ("Ketchum"), a former client of the law firm, filed an action in state court alleging that Feldman, Gilbert, and the law firm breached their professional duties in handling Ketchum's personal injury lawsuit.  (Dkt. 27-1; Dkt. 8 at 2, ¶ 5).  Specifically, Ketchum alleged that he hired the law firm to pursue a claim for injuries that he suffered while working as a civilian contractor in

---

[1] Gilbert now works for a different law firm, and he is not a party to the instant action.  (*See* Dkt. 27-2 at 6; Dkt. 2 at 1).

Afghanistan.  (Dkt. 27-1 at ¶¶ 6-7).  Feldman, Gilbert, and the law firm filed an action in the U.S. District Court for the Middle District of Florida against BAE Systems Land & Armaments, L.P. and SSG Marvin L. Williams[2] ("the tort action").  (*Id*. at ¶ 8).

While the tort action was pending, Ketchum also had a pending claim for federal workers' compensation benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), and he was receiving temporary total disability indemnity benefits and medical benefits.  (*Id*. at ¶¶ 9, 10).  Feldman and Gilbert knew that Ketchum had a federal workers' compensation claim and that he was receiving benefits.  (*Id*. at ¶ 11).

On July 29, 2011, at the advice and urging of Feldman and Gilbert, Ketchum entered into a full and final settlement of the tort action.  (*Id*. at ¶ 12).  Feldman and Gilbert did not obtain prior written approval for the settlement from Ketchum's employer, Brown International Corporation d/b/a AAR Integrated Technologies ("Brown") or from Brown's workers' compensation insurer, Zurich American Insurance Company ("Zurich").  (*Id*. at ¶ 13).

After Zurich learned of the settlement, it terminated Ketchum's right to compensation, effective August 9, 2011, because Ketchum failed to obtain Brown's prior approval of the settlement, in violation of the LHWCA.  (*Id*. at ¶¶ 14, 16).  Ketchum alleged that Feldman and Gilbert had a duty to know the law governing third-party tort claim settlement agreements for clients with pending federal workers' compensation claims, and that they had

---

[2] The complaint in the malpractice action does not specify the meaning of "SSG."  (Dkt. 27-1 at ¶ 8).

a duty to comply with the provisions of the LHWCA by obtaining prior approval.   (*Id.* at ¶ 17).   Ketchum alleged that Feldman and Gilbert breached their duties by having Ketchum enter into a settlement of his tort claim without obtaining the necessary prior approval.   (*Id.* at ¶ 18).   As a result, Ketchum alleged that he suffered the loss of his indemnity and medical benefits beginning on August 9, 2011, and that he continues to suffer those losses.   (*Id.* at ¶ 19).

The state-court malpractice action ("the malpractice action") was served on the law firm on June 14, 2013.   (Dkt. 28-1 at 1).   Gilbert was served on June 17, 2013, and Feldman was served on June 18, 2013.   (*Id.*).

### *Imperium denies coverage*

Imperium received notice of the malpractice action on June 18, 2013.   (Dkt. 2 at 56). By letter dated August 29, 2013, Imperium refused to defend or indemnify Feldman and the law firm.   (*Id.* at 47).   As one basis for denying coverage, Imperium cited the policy's prior-knowledge exclusion, which provided that the policy did not apply to claims arising out of a wrongful act, "if the insured at or before the effective date knew or could have reasonably foreseen that such wrongful act might be expected to be the basis of a claim."   (*Id.* at 52-55; Dkt. 27-7 at 27).   According to Imperium, the undisputed facts showed that Feldman and the law firm knew that the settlement of the tort action caused the loss of Ketchum's workers' compensation benefits and therefore might be expected to be the basis of a malpractice claim. (Dkt. 2 at 55).

On June 10, 2014, Plaintiffs filed a two-count action in the state court.  (Dkt. 2). Invoking this Court's diversity jurisdiction, Imperium removed the action on July 1, 2014. (Dkt. 1).  In Count I, Plaintiffs request a declaratory judgment that they are entitled to a defense and indemnity for any liability arising out of the claims in the malpractice action. In Count II, Plaintiffs allege that Imperium breached the policy by wrongfully refusing to defend and indemnify Plaintiffs in the malpractice action.

The parties filed their cross-motions for summary judgment on July 31, 2015.  (Dkts. 27, 28).  Imperium and Plaintiffs rely on different evidence to advance their respective positions as to whether Feldman or Gilbert "knew or could have reasonably foreseen" that the failure to obtain settlement approval "might be expected to be the basis of a claim."

### *Imperium's evidence relating to prior knowledge*

On January 5, 2011, Gilbert's assistant, Wendy Bennet, emailed Ketchum's federal workers' compensation attorney, Capp Taylor, as follows: "Mr. Gilbert is inquiring on whether or not there is a w/c lien that would be claimed if we settled the civil case in our office."  (Dkt. 27-2 at 66).  Taylor replied: "I have no idea as to whom your third party case is against but wc liens would attach against negligent third parties causing damages that the Fed wc program has paid for and even may involve surplus credit against future wc benefits." (*Id.*).  During his deposition, Gilbert acknowledged that this email informed the law firm that federal workers' compensation liens would attach to any tort case.  (Dkt. 27-2, "Gilbert Dep." at 21).  Prior to settling, Gilbert did not look into whether settling the tort action would affect the workers' compensation claim. (Gilbert Dep. at 24-25).

By letter dated July 15, 2011, two weeks before the settlement, Zurich informed Gilbert that Zurich was claiming a total lien of at least $144,718.06. (Gilbert Dep. at 22; Dkt. 27-2 at 67). After the settlement, by letter dated August 12, 2011, Zurich informed Gilbert that "[t]he Employer/Carrier has not waived its lien or approved the settlement under section 933 of the Act." (Gilbert Dep. at 33-34; Dkt. 27-2 at 74).[3]  By letter dated August 16, 2011, Robert Bamdas, an attorney representing Zurich, informed Gilbert that the settlement was not approved by Brown or Zurich as required under Section 933 of the LHWCA, and, as a result, Ketchum's right to future benefits was barred. (Gilbert Dep. at 40-41; Dkt. 27-2 at 75). Bamdas also noted that the settlement of $155,000.00 was "clearly less" than the expected benefits to be paid by Zurich. (*Id*.).

Gilbert testified that he "probably" first discovered the settlement "potentially impacted" Ketchum's benefits when he received Zurich's August 12, 2011 letter. (Gilbert Dep. at 39). Gilbert testified that he imagined that he would have brought Zurich's August 16, 2011 letter to Feldman's attention, although he did not recall specifically. (*Id*. at 41-42).

On August 15, 2011, Ketchum's mother, Gale Ketchum, sent Gilbert an email as follows:

> According [*sic*] the Chief Director (OWCP-Washington) you, as an Attorney were to have sent for LS-33 to have Angela Kirby fill it out and authorize the

---

[3] Pursuant to 33 U.S.C. § 933(g)(2) of the LHWCA: "If no written approval of the settlement is obtained and filed as required by paragraph (1), or if the employee fails to notify the employer of any settlement obtained from or judgment rendered against a third person, all rights to compensation and medical benefits under this chapter shall be terminated, regardless of whether the employer or the employer's insurer has made payments or acknowledged entitlement to benefits under this chapter."

> 3rd party suit.  According to the Chief, if you have no proof that you sent her the form, Chad loses all of his WC benefits.  I have sent you the laws so you can read them.  Did you ever notify Zurich of the lawsuit, if so do you have proof of receipt?
>
> Thanks,
> Gale Ketchum

(Dkt. 27-2 at 77).  Chad Ketchum testified that he asked Gilbert, "can you fix this?" and "I was assured that he would fix it."  (Ketchum Dep. at 16-17).

According to Taylor, Ketchum's workers' compensation attorney, he "told them that they just screwed up the guys [*sic*] workers' comp case that would by [*sic*] worth probably over a million dollars.  And they said – they indicated that they didn't think that was the case, and that they could negotiate out the lien."  (Dkt. 27-5, "Taylor Dep." at 13).  Taylor testified that he did not recall whether Ketchum or his mother ever told him they intended to pursue a malpractice claim, but that "I knew darn well that they were probably going to pursue it, or at least talk to somebody about pursuing it," and the thought of a malpractice claim "certainly crossed my mind."  (*Id*. at 19).

 On January 6, 2012, Gilbert filed a motion to invalidate the lien in the tort action.  (Dkt. 27-2 at 78; Dkt. 27-3 at 15).  On January 24, 2012, the Honorable Steven D. Merryday denied the motion.  Judge Merryday observed that under Section 933(g)(2) of the LHWCA:

> a worker who ignores the consent requirement forfeits future benefits. . . . Ketchum settled his claims against BAE without Brown's permission, and Brown ceased paying benefits.  Looking outward for the cause of his oversight, Ketchum seeks to invalidate Brown's lien on the ground that Brown knew of Ketchum's settlement negotiation but waited until after the settlement to assert the lien.  The arguments aiming to shift responsibility to

Brown—estoppel and constructive consent, among others—stretch to a respectable length.

(Dkt. 27-3 at 15-16).  Without reaching the merits of the arguments, Judge Merryday held that Ketchum's basis for reopening the case was inadequate, as the lien issue involved a new dispute against a new party.  (*Id*. at 17).  Judge Merryday further observed that: "The untimeliness of Ketchum's motion adds another ground for leaving the case closed.  After learning in August, 2011, that Brown planned to enforce the lien, Ketchum waited five months before seeking relief in this action.  A five-month delay is pardonable if sufficiently explained, but Ketchum never tries." (*Id*.).  Judge Merryday also denied Brown's request to enforce the lien.  (*Id*. at 18).

### *Plaintiffs' evidence relating to prior knowledge*

Feldman testified that he thought it was Taylor's responsibility to have protected the workers' compensation benefits.  (Dkt. 30 "Feldman Dep." at 95).  Taylor did not inform the law firm of any requirement to seek approval from the workers' compensation carrier prior to settling the tort action.  (*Id*. at 50-51).  When Feldman learned that Zurich denied benefits after the settlement, he offered to help because he thought Zurich was being "underhanded or sneaky or improper." (*Id*. at 63).  Feldman also knew that Taylor was "going to go to hearing, or do whatever you do in a federal work comp case, to secure his benefits," and Feldman assumed that Ketchum settled that dispute or received his benefits.  (*Id*. at 62, 95).  After being served with Ketchum's malpractice action, Feldman called Taylor to ask what happened.  (*Id*.).  Taylor sent Feldman a copy of the decision denying benefits and did not

explain why Ketchum failed to appeal that decision. (*Id*. at 62-63). Feldman assumed that anything that had happened "was an issue between Mr. Taylor and Mr. Ketchum, and we had no part of that." (*Id*. at 63).

Until Ketchum filed the malpractice action, he never expressed any dissatisfaction with the law firm. (*Id*. at 39, 65). There was no indication from anyone, including Taylor, Ketchum, or Ketchum's mother, that the law firm had done anything wrong. (*Id*. at 74, 95; Gilbert Dep. at 14). Taylor testified that he did not tell anyone at the firm that they could be looking at a malpractice action and that "nobody was pointing their fingers at anybody." (Taylor Dep. at 18-19). Ketchum testified that he did not show any frustration toward the firm because he feared it would prevent them from helping him, and he never directly blamed the law firm or told the attorneys that he would file a malpractice lawsuit. (Ketchum Dep. at 25-26). Likewise, Ketchum's mother testified that she did not express frustration, blame the law firm for losing benefits, say anything about a possible malpractice lawsuit, or indicate that the law firm made any kind of mistake. (Dkt. 35, "Gale Kethcum Dep." at 17-18, 24-25).

After Judge Merryday denied relief in the tort action, Ketchum signed a closing statement with the law firm, dated February 23, 2012, which provided, in relevant part: "I am completely satisfied with the above compromise settlement, with the services of the firm and my attorney, and with the amount of the fee charged and with the expenses listed on Page I of this closing/settlement statement." (Dkt. 33-2).

Imperium objects to the authenticity of the closing statement. (Dkt. 41 at 5-6). It submits another version of the closing statement, which has the word "VOID" written in

capital letters at the bottom of the page. (Dkt. 41-1). Imperium also argues that the signature on the closing statement is significantly different than Ketchum's distinctive signature on other documents. Imperium submits five examples of Ketchum's signature to highlight the disparity. (Dkt. 41-2). Plaintiffs maintain that the authenticity of the document is not relevant because, even if the document was not signed by Ketchum, Plaintiffs would not necessarily be aware of that fact. (Dkt. 44 at 2 n. 1).

### *Standard*

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *See id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *See id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the

nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  *See Anderson*, 477 U.S. at 248–49.

## *Discussion*

Imperium argues that judgment is warranted in its favor based on the policy's prior-knowledge exclusion, or, in the alternative, pursuant to Fla. Stat. § 627.409(1), which allows an insurer to void coverage if the insured misrepresents facts in an insurance application. Plaintiffs' cross-motion for partial summary judgment addresses four of Imperium's affirmative defenses.  The Court evaluates the parties' arguments in turn.  For the reasons set forth below, Imperium's motion for summary judgment is denied, and Plaintiffs' partial motion for summary judgment is granted.

### A.    *Applicable law*

In diversity cases, a federal court applies the substantive law of the forum state. *Cambridge Mut. Fire Ins. Co. v. City of Claxton*, 720 F.2d 1230, 1232 (11th Cir. 1983).  In Florida, "the legal effects of terms of the insurance policy and rights and obligations of persons insured thereunder are to be determined by the law of the state where the policy was issued." *LaTorre v. Conn. Mut. Life Ins. Co.*, 38 F.3d 538, 540 (11th Cir. 1994). The parties agree that the policy was issued in Florida, and that Florida law governs.

Plaintiffs allege that Imperium owes them a duty to defend the malpractice action, as well as a duty to indemnify, and that Imperium has breached those duties.  As a general rule,

an insurer's duty to defend is determined based "solely on the facts and legal theories alleged in the pleadings and claims against the insured." *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995).  A duty to defend arises when the pleadings "allege facts that fairly and potentially bring the suit within policy coverage." *Id.* (internal quotation marks omitted).  An insurer is obligated to defend the entire suit, even if only one claim is within the policy's coverage. *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So. 2d 810, 813-14 (Fla. 1st DCA 1985). "If the allegations of the complaint leave any doubt regarding the duty to defend, the question must be resolved in favor of the insured requiring the insurer to defend." *Id.* at 814. "[T]he insurer must defend even if facts alleged are actually untrue or legal theories unsound." *Lawyers Title Ins. Corp.*, 52 F.3d at 1580.

In contrast to the duty to defend, the duty to indemnify "must be determined by analyzing the policy coverage in light of the actual facts in the underlying case." *J.B.D. Const., Inc. v. Mid-Continent Cas. Co.*, 571 F. App'x 918, 927 (11th Cir. 2014) (citing *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1077 n.3 (Fla. 1988)).  As a result, a determination as to the duty to indemnify is generally premature prior to entry of a final judgment, settlement, or final resolution of the underlying action.  *Id.*; *Khatib v. Old Dominion Ins. Co.*, 153 So. 3d 943, 947-48 (Fla. 1st DCA 2014) ("The duty to indemnify is thus often dependent upon further factual development through discovery or at trial.").  However, because the duty to defend is broader than the duty to indemnify, a finding that there is no duty to defend also means there is no duty to indemnify.  *Fun Spree Vacations, Inc. v. Orion Ins. Co.*, 659 So. 2d 419, 422 (Fla. 3d DCA 1995).

The interpretation and construction of an insurance contract is a question of law. *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015). "[Courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Policy terms are to be given their plain and ordinary meaning. *Bethel v. Sec. Nat'l Ins. Co.*, 949 So. 2d 219, 222 (Fla. 3d DCA 2006). If policy language is susceptible to two reasonable interpretations, one providing coverage and the other limiting coverage, the policy is considered ambiguous. *Anderson*, 756 So. 2d at 34. An ambiguous policy provision is construed strictly against the insurer and liberally in favor of the insured. *Id.* Policy exclusions "are always strictly construed." *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 4th DCA 1997). The insured bears the burden of proving that a claim is covered under the policy, while the insurer bears the burden of proving the applicability of any exclusion. *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997).

## B.   *Prior-knowledge exclusion*

The policy provides coverage as follows:

The Company shall pay on behalf of any INSURED all DAMAGES in excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against an INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter, by reason of any WRONGFUL ACT occurring on or after the RETROACTIVE DATE, if any. Coverage shall apply to any such CLAIMS arising out of the conduct of the INSURED's profession as a Lawyer[.]

(Dkt. 27-7 at 20).  The policy defines "wrongful act" to include any actual or alleged act, error, omission, misstatement, misleading statement, or neglect or breach of duty.  (*Id.* at 26).  In its motion for summary judgment, Imperium does not dispute that Ketchum's malpractice action implicates the foregoing coverage provision.

Instead, Imperium argues that coverage is excluded under the policy's prior-knowledge exclusion, which provides that the policy does not apply to:

II.     any CLAIM arising out of any WRONGFUL ACT occurring prior to the effective date of this policy if:

. . .

B.     if the INSURED at or before the effective date knew or could have reasonably foreseen that such WRONGFUL ACT might be expected to be the basis of a CLAIM.  However, this paragraph B. does not apply to any INSURED who had no knowledge of or could not have reasonably foreseen that any such WRONGFUL ACT might be expected to be the basis of a CLAIM[.]

(*Id.* at 27).

Courts have held that similar prior-knowledge exclusions are unambiguous, and neither party in this case asserts that an ambiguity exists.  *See Lawyers Prof'l Liab. Ins. Co. v. Dolan, Fertig & Curtis*,  524 So. 2d 677, 678 (Fla. 4th DCA 1988) (observing that a similar exclusion was unambiguous); *Westport Ins. Corp. v. Lilley*, 292 F. Supp. 2d 165, 171 (D. Me. 2003) (surveying cases from multiple jurisdictions finding the exclusion to be unambiguous).  Accordingly, the exclusion will be applied based on its plain meaning.

The prior-knowledge exclusion may be triggered under two circumstances: (1) if the insured "knew" that a wrongful act might be expected to be the basis of a claim; or (2) if the

insured "could have reasonably foreseen" that a wrongful act might be expected to be the basis of a claim.  The first prong requires an insured to have actual knowledge, as evaluated under a subjective standard.  *Fid. Nat'l Title Ins. Co. v. Houston Cas. Co.*, No. 6:11-cv-1438, 2012 WL 4523666, at *5 (M.D. Fla. Sept. 30, 2012).   By contrast, the second prong involves both a subjective and objective component.   Whether an insured "could have reasonably foreseen" that a wrongful act might be expected to be the basis of a claim is an objective inquiry, but it must be based on the facts subjectively known by the insured.   *Lilley*, 292 F. Supp. 2d at 171; *e.g., Eddy v. Cont'l Cas. Co.*, 784 F. Supp. 2d 1331, 1342 (M.D. Fla. 2011) (holding that the insureds had an objective basis to believe a claim might be filed based on the insureds' awareness of circumstances that might lead to a claim); *Fishman v. Hartford*, 980 F. Supp. 2d 672, 679 (E.D. Pa. 2013) (same).

### 1. Duty to defend

Florida courts typically determine whether an insurer has a duty to defend by comparing the allegations in the underlying complaint to the coverage afforded under the policy.  *Lawyers Title Ins. Corp.*, 52 F.3d at 1580.  In this case, however, Imperium argues that consideration of evidence beyond the underlying complaint is proper.   In response, Plaintiffs maintain that review should be limited to the underlying complaint, but they offer their own extrinsic evidence to rebut Imperium's evidence.   In its reply brief, Imperium contends that the underlying allegations, by themselves, support application of the prior-knowledge exclusion.

The underlying complaint alleges that Gilbert and Feldman had a duty to comply with the LHWCA and obtain settlement approval, that they breached that duty, and that Ketchum suffered damages as a result. (Dkt. 27-1, ¶¶ 17-19). Imperium does not dispute that these allegations fall within the policy's general coverage provision. (Dkt. 27-7 at 20). And contrary to Imperium's position, the underlying complaint does not include any allegations demonstrating that the prior-knowledge exclusion applies. For instance, the complaint alleges no facts indicating that, prior to the policy's effective date of December 20, 2012, Gilbert or Feldman knew or could have foreseen that their alleged breach might be expected to be the basis of a claim. Indeed, the complaint does not allege that Gilbert or Feldman were aware, at any time, that they breached a duty. (*See generally* Dkt. 27-1).

At the least, the allegations of the underlying complaint leave doubt as to the duty to defend. Under these circumstances, Florida courts would typically hold that any doubt is resolved in favor of the insured, requiring Imperium to defend. *Baron Oil Co.*, 470 So. 2d at 814.

### a. *Exceptions to the general rule*

Nonetheless, as Imperium argues, Florida courts have considered evidence extrinsic to the underlying complaint in certain circumstances. For instance, Florida's Third District Court of Appeal has allowed an insurer to rely on extrinsic evidence to argue that "the alleged insured is not in fact an insured under the policy." *Nateman v. Hartford Cas. Ins. Co.*, 544 So. 2d 1026, 1027 (Fla. 3d DCA 1989) (reasoning that "the creation of the basic insurer-insured relationship and the ensuing duty to defend cannot be left to the imagination

of the drafter of a complaint . . . and as to who is an insured, the facts as they actually exist must be determinative"). Florida's First District Court of Appeal has permitted comparison of the underlying complaint to a complaint filed in a prior action, in order to assess the applicability of a "prior-litigation" exclusion. *Acosta, Inc. v. Nat'l Union Fire Ins. Co.*, 39 So.3d 565, 574-75 (Fla. 1st DCA 2010) (holding that "[c]onsideration of the prior complaint was entirely proper . . . because its existence and authenticity was undisputed."). More recently, the Eleventh Circuit held, in an unpublished opinion,[4] that an insurer may consider the date on which an insured provides written notice of a claim, in order to determine whether the insured timely notified the insurer of a claim, because the evidence was "uncontroverted" and because the "date of written notice to the insurance company is not a fact that would normally be alleged in the [underlying] complaint." *Composite Structures, Inc. v. Cont'l Ins. Co.*, 560 F. App'x 861, 865-66 (11th Cir. 2014) (citing *Higgins v. State Farm Fire & Cas. Co.*, 894 So. 2d 5, 10 n.2 (Fla. 2005)).[5]

In *Nationwide Mutual Fire Insurance Co. v. Keen*, Florida's Fourth District Court of Appeal held that an insurer was relieved of the duty to defend "if uncontroverted evidence

---

[4] In the Eleventh Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2; *United States v. Rodriguez,* 751 F.3d 1244, 1252 n.5 (11th Cir. 2014).

[5] Opinions from other jurisdictions are in accord. Courts reason that certain types of extrinsic evidence relevant to fundamental coverage issues, such as whether the notice of a claim is timely or whether the claim is related to prior claims, will not overlap with the merits of the underlying action or call into question the truth or falsity of any allegations in the underlying complaint. *See Edwards v. Lexington Ins. Co.*, 507 F.3d 35, 40–41 (1st Cir. 2007); *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 531 (5th Cir. 2004); *Worthington Fed. Bank v. Everest Nat'l Ins. Co.*, No. 5:14-cv-244, ___ F. Supp. 3d ___, 2015 WL 3898093, at *21 (N.D. Ala. Jun. 4, 2015); *Biochemics, Inc. v. Axis Reins. Co.*, 963 F. Supp. 2d 64, 70 (D. Mass. 2013).

places the claim outside of coverage, and the claimant makes no attempt to plead the fact creating coverage or suggest the existence of evidence establishing coverage." 658 So. 2d 1101 (Fla. 4th DCA 1995). In *Keen*, the insured had "unequivocally disclosed" that he was operating a water craft with a 40-horsepower engine, which all the parties agreed was not covered under the policy. *Id.* at 1102. The court therefore confronted the issue of "whether there is any reason why a carrier must defend an insured who concedes a critical fact against his monetary interest that places a claim beyond the carrier's obligation to pay." *Id*. The court reasoned that the duty to defend, while typically described as broader than the duty to indemnify, actually meant "that the carrier must defend a claim that may ultimately be covered until it is certain that it is not covered." *Id*. at 1102-03. The court observed that consideration of uncontroverted evidence, in the absence of allegations establishing coverage, was "founded on logic and fairness." *Id*. at 1103.

The Eleventh Circuit, in an unpublished decision, has characterized *Keen* as "depart[ing] from the general principle of determining the duty to defend only from the allegations in the complaint." *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 785 (11th Cir. 2008). In *First Specialty*, the Eleventh Circuit reversed the district court, which had considered extrinsic evidence in determining the applicability of an exclusion, and emphasized that *Keen* and a similar federal district court case "are best seen as exceptional cases in which courts have crafted an equitable remedy when it is manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage." *Id*. at 786. In a recent published opinion, the Eleventh Circuit iterated this principle and clarified that

consideration of extrinsic evidence was reserved for "special circumstances" in which extrinsic "facts are undisputed, and, had they been pled in the complaint, they clearly would have placed the claims outside the scope of coverage." *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1323-24 (11th Cir. 2014) (declining to determine whether resort to extrinsic evidence was proper because there was no duty to indemnify).

### b. The instant case supports no exception

In an attempt to fit the instant case into an exception allowing consideration of extrinsic evidence, Imperium argues that it is "undisputed" that Gilbert and the law firm had notice of the alleged error and the potential for a claim.  (Dkt. 27 at 14).  In particular, Imperium cites the following extrinsic facts:

> In his January 6, 2011 email, Taylor informed Gilbert's legal assistant that workers' compensation liens could attach in the tort action.

> By letter dated July 15, 2011, Zurich informed Gilbert that they had a current lien in the amount of $144,718.06.

> By letter dated August 12, 2011, Zurich informed Gilbert that the employer/carrier had not waived its lien or approved the settlement under the LHWCA.

> Gilbert was aware that the settlement "potentially impacted" Ketchum's benefits at some point after the settlement, probably when he received the August 12, 2011 letter.

> Gale Ketchum's August 15, 2011 email stated, in part: "According to the Chief, if you have no proof that you sent her the form, Chad loses all of his WC benefits."

> By letter dated August 16, 2011, Zurich's attorney informed Gilbert that the settlement was not approved by the employer or Zurich and therefore barred Ketchum's right to future benefits under the LHWCA.  The attorney also noted

that the settlement was "clearly less" than expected benefits to be paid by Zurich.

Gilbert assured Ketchum that he "would fix it."

Taylor "told them that they just screwed up the guys [*sic*] workers' comp case that would by [*sic*] worth probably over a million dollars." Taylor also testified that the thought of a malpractice suit "certainly crossed by mind."

Judge Merryday's January 24, 2012 order observed that "a worker who ignores the consent requirement forfeits future benefits."

Based on the foregoing facts, Imperium argues that Gilbert and Plaintiffs "were well aware of an error and at the very least could have reasonably foreseen that the error might be expected to be the basis of the claim." (*Id*. at 16).

In support of its position, Imperium relies on cases addressing the application of similar prior-knowledge exclusions.  As Plaintiffs argue, however, these cases addressed situations in which there was undisputed and direct evidence that an insured knew a claim might be filed.  For instance, in *Lawyers Professional Liability Insurance Company v. Dolan, Fertig & Curtis*, it was undisputed that, prior to the policy's effective date, the insured received notice from a former client of the claim for malpractice.  524 So. 2d at 678.  In *Coregis Insurance Company v. McCollum*, it was undisputed that an insured wrote a memorandum to other lawyers in the firm documenting her belief that a client might file a malpractice claim.  961 F. Supp. 1572, 1576, 1579 (M.D. Fla. 1997); *see also Eddy*, 784 F. Supp. 2d at 1342 (observing than an email "irrefutably shows that a malpractice claim was

actually foreseen by at least one partner at [the accounting firm] and that this concern was shared with other [] partners").[6]

In this case, by contrast, Imperium cites no undisputed, direct evidence that either Gilbert or Feldman knew of the potential for a claim.  Moreover, Plaintiffs offer their own competing evidence, which they argue negates any inference that Gilbert or Feldman knew, or could have reasonably foreseen, that the failure to obtain settlement approval might be expected to be the basis of a claim.

Specifically, Plaintiffs rely on the closing statement purportedly signed by Ketchum, dated February 23, 2012, which provided that "I am completely satisfied with the above compromise settlement, with the services of the firm and my attorney, and with the amount of the fee charged and with the expenses listed on Page I of this closing/settlement statement."  (Dkt. 33-2).  As outlined above, Imperium raises a substantial challenge to the authenticity of the document.  For purposes of the instant motion, the Court declines to consider the closing statement, as Plaintiffs neither authenticate the document nor cite any evidence indicating that Gilbert or Feldman reviewed the closing statement or relied on it. *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 113 (11th Cir. 2010)  ("[t]o be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule

---

[6] In *Eddy*, the accounting firm also received a letter from an attorney retained to represent the former clients, which mentioned "several acts or omissions that seem obvious to me to rise to the level of professional malpractice," and directed the firm to "consider this letter our formal request that you provide a copy of this correspondence to your malpractice or errors & omission carrier, and ask the carrier to contact us as soon as possible."  784 F. Supp. 2d at 1341.

56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence"). At best, Feldman testified that there should have been a closing statement and that it would have been the responsibility of the office administrator to obtain one, prior to releasing settlement funds, but he did not know when Ketchum signed it. (Feldman Dep. at 39-41, 92-94).

Nonetheless, Plaintiffs produce other evidence relevant to Feldman's and Gilbert's knowledge of the potential for a claim. For instance, Ketchum and his mother testified that they expressed no dissatisfaction toward the law firm, they did not indicate that a mistake had been made, and they did not mention a possible malpractice lawsuit. (Feldman Dep. at 39, 65, 74, 95; Gilbert Dep. at 14; Ketchum Dep. at 25-26; Gale Ketchum Dep. at 17-18, 24-25). Plaintiffs argue that Taylor's testimony is potentially self-interested, and, in any event, is undermined by subsequent testimony that he did not tell anyone at the firm that they could be looking at a malpractice action, and that "nobody was pointing their fingers at anybody." (Taylor Dep. at 18-19). Plaintiffs also note that Judge Merryday's January 24, 2012 order was limited to deciding whether to reopen the tort action and did not determine the merits of the lien issue. (Dkt. 27-3 at 14-18). According to Feldman, he knew that Taylor was "going to go to hearing, or do whatever you do in a federal work comp case, to secure his benefits," and Feldman assumed that Ketchum settled that dispute or received his benefits. (Feldman Dep. at 62, 95).

In cases involving similar conflicting evidence, courts are split as to which facts are relevant in determining whether an attorney "could have reasonably foreseen" that a claim

might be filed.  One line of cases considers only whether the attorney knew that he made a mistake and rejects any additional consideration of the attorney's subjective impressions or beliefs—such as the attorney's belief that the client would not sue for malpractice based on the client's assurances that he would not sue, or the attorney's belief that an adverse decision would be reversed on appeal.  *McCollum*, 961 F. Supp. at 1579; *Mt. Airy Ins. Co. v. Thomas*, 954 F. Supp. 1073, 1079-80 (W.D. Pa. 1997); *Westport Ins. Corp. v. Jacobs & Barbone, P.A.*, No. 1:08-cv-801, 2009 WL 922023, at *6-7 (D. N.J. Mar. 31, 2009); *Ross v. Cont'l Cas. Co.*, 420 B.R. 43, 55 (D. D.C. 2009).  These courts reason that, regardless of whether the attorney had reasons for believing the client would not file a claim, the knowledge that a mistake was made, standing alone, is enough to reasonably foresee that a claim "might" be filed.[7]  *See Mt. Airy Ins. Co.*, 954 F. Supp. at 1080 (observing that whether "the client *would* make a claim is not relevant to our analysis"); *Westport Ins. Co. v. Goldberger & Dubin, P.C.*, 255 F. App'x 593, 594-595 (2d Cir. 2007) (noting that "even a low probability of suit would trigger" the prior-knowledge exclusion).  Additionally, an attorney's subjective beliefs "could too easily be related after the fact to excuse an attorney's failure to report known potential claims" and "would defeat the ability of an insurance company to assess risk prior to issuing insurance."  *Mt. Airy Ins. Co.*, 954 F. Supp. at 1079; *Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.*, 636 F.3d 1300, 1303 (10th Cir. 2011) (explaining that

---

[7] Although Plaintiffs do not raise this argument, it is not clear from review of Gilbert's deposition testimony that he knew or acknowledged that a mistake was made.  Gilbert testified that the law firm did, in fact, obtain consent and approval for the settlement from Zurich because Zurich or one of their affiliates issued a check to settle the tort case.  (Gilbert Dep. at 35, 36-37, 50, 58).

prior-knowledge exclusions prevent an insured from unfairly obtaining coverage for the risk of a known loss).

By contrast, other courts will consider the attorney's subjective beliefs and impressions in assessing the applicability of prior-knowledge exclusion, including whether the client expressed satisfaction or dissatisfaction with the attorney, the client's history of dealing with the attorney, the amount of time that elapsed between the end of representation and the filing of a malpractice suit, and the complexity of the legal issue allegedly mishandled by the attorney.   *See, e.g., Kopelowitz v. Home Ins. Co.*, 977 F. Supp. 1179, 1189-90 (S.D. Fla. 1997) (attorney knew of client's unhappiness with representation); *Coregis Ins. Co. v. Goldstein*, 32 F. Supp. 2d 508, 512-13 (D. Conn. 1998) (clients did not indicate to any member of the law firm that they planned to file a malpractice action, there was a five-month period between the end of representation and the effective date of the policy, and the relevant statute of limitations issue was complex); *United Nat. Ins. Co. v. Granoff, Walker & Forlenza, P.C.*, 598 F. Supp. 2d 540, 547-48  (S.D.N.Y. 2009) (client continued to use the law firm after the relevant events occurred); *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 308 (3d Cir. 2001) (client expressed dissatisfaction).  As one court has observed, these are all factors that an objectively reasonable attorney would consider in assessing the probability that a claim "might" be filed.  *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F. Supp. 2d 601, 610-11 (E.D. Tex. 2003).   Moreover, limiting the inquiry to whether an attorney knew or acknowledged that a mistake had been made could substantially undermine the protections of a claims-made

policy, which is intended to provide coverage based on when claims are made, not when the wrongful act allegedly occurred.  *Id.* at 610.

In this case, the parties do not address the split in authority, and neither side cites Florida state case law on the subject.  However, the Court need not determine how the Florida Supreme Court would decide the issue.  For the purpose of assessing its duty to defend, Imperium was required to resolve the split in authority in Plaintiffs' favor and consider the evidence relating to Gilbert's and Feldman's subjective beliefs.  *See Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240, 1246 (11th Cir. 2015) (holding that, under Florida law, an insurer was required to resolve an acknowledged split in authority on coverage issue in favor of the insured and offer a defense).

The evidence relating to Gilbert's and Feldman's subjective beliefs is enough to raise a factual issue as to whether they knew or could have reasonably foreseen that the failure to obtain settlement approval might be expected to be the basis of a claim.  For instance, Plaintiffs cite undisputed evidence that neither Ketchum nor his mother ever expressed any dissatisfaction with the law firm.  Further, at least Feldman believed that the matter had been resolved because he knew that Taylor was addressing the benefits issue in the administrative setting.[8]

---

[8] As Plaintiffs argue, the prior-knowledge exclusion expressly provides that it will not apply to "any insured who had no knowledge of or could not have reasonably foreseen that any such wrongful act might be expected to be the basis of a claim." (Dkt. 27-7 at 27).  The difference in the degree of knowledge possessed by Feldman and Gilbert is material in assessing Imperium's duty to defend because the duty to defend is triggered even if one claim in the underlying complaint falls within coverage.  *Baron Oil Co.*, 470 So. 2d at 813-14.

Because there is a factual issue, the facts on which Imperium relies are not "uncontroverted" or "undisputed," and it is therefore not "certain" that coverage is excluded. *Keen*, 658 So. 2d at 1102-03; *Composite Structures, Inc.*, 560 F. App'x at 866.  Indeed, the parties' competing versions of the facts and the circumstantial nature of the evidence, by themselves, suggest that this is not the "exceptional case" in which it is "manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage." *Stephens*, 749 F.3d at 1323 (internal quotation marks omitted).  Rather, the parties "explicitly contest" whether the prior-knowledge exclusion places the claim outside of coverage.  *See First Specialty Ins. Corp.*, 300 F. App'x at 787 (holding that consideration of extrinsic evidence was improper, in part, because the parties explicitly contested the district court's finding that false imprisonment was inherently intertwined with an assault and battery, so as to implicate an assault-and-battery exclusion).

Accordingly, extrinsic evidence does not support the denial of Imperium's duty to defend.  *First Specialty Ins. Corp.*, 300 F. App'x at 786-87.  For the reasons set forth above, the allegations in the underlying complaint otherwise trigger coverage.  Imperium's motion for summary judgment is therefore denied to the extent that Imperium seeks to avoid the duty to defend based on the prior-knowledge exclusion.

### 2.  *Duty to indemnify*

The duty to indemnify is narrower than the duty to defend, and it is generally determined based on the actual facts of the underlying case.  *Stephens*, 749 F.3d at 1324. Here, a decision on the applicability of the prior-knowledge exclusion will necessarily

overlap with the merits of Ketchum's malpractice action.  For instance, in assessing whether an attorney "could have reasonably foreseen" that a wrongful act might be expected to be the basis of a claim, courts frequently consider the obviousness of the alleged breach and whether the attorney knew that he made a mistake.  *E.g., Goldberger & Dubin, P.C.*, 255 F. App'x at 594-595 (basing application of a prior-knowledge exclusion on "the clear evidence of a breach of duty"); *Ross*, 420 B.R. at 54 n.7 (noting that attorney admitted the mistake); *see also Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F. Supp. 2d at 611 (explaining that a gross or glaring breach of duty might, regardless of other evidence, support a finding that an attorney had an objective basis to believe a claim might be filed); *Mt. Airy Ins. Co.*, 954 F. Supp. at 1080 (reasoning that an attorney must be aware that he made an error because if an attorney does not know he has made an error, "he can not know or expect that a malpractice claim might or could result.").

Imperium does not assert that Ketchum's malpractice action has concluded. Accordingly, to the extent that Imperium moves for summary judgment on its duty to indemnify (Dkt. 27 at 10), the motion is denied without prejudice, as premature.  *Khatib*, 153 So. 3d at 947-48.

### 3. Breach of contract

In addition to seeking a declaratory judgment regarding the duty to defend and indemnify (Count I), Plaintiffs' raise a breach-of-contract claim (Count II).  (Dkt. 2, ¶¶ 18-21).  Because that claim is premised on Imperium's failure to defend and indemnify,

Imperium's motion for summary judgment is denied as to Count II, for the reasons set forth above.

**C.    *Fla. Stat. § 627.409(1)***

As an alternative basis for summary judgment, Imperium argues that coverage is barred pursuant to Fla. Stat. § 627.409(1) because Feldman made an inaccurate statement on his application for the Imperium policy.  (Dkt. 27 at 17-19).  Specifically, Question 30 on the application asked: "after inquiry, are any attorneys in your firm aware . . . of any legal work or incidents that might reasonably be expected to lead to a claim or suit against them?"  (Dkt. 27-6 at 7).  Feldman checked "no."  (*Id.*).

Section 627.409(1) provides that a "misrepresentation, omission, concealment of fact, or incorrect statement" in an application may prevent recovery under an insurance policy if the statement or omission: (1) is an intentional act of fraud; (2) is material to the insurer's acceptance of risk; or (3)  "[i]f the true facts had been known to the insurer pursuant to a policy requirement or other requirement, the insurer in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss."  Fla. Stat. § 627.409(1); *Mora v. Tower Hill Prime Ins. Co.*, 155 So. 3d 1224, 1227-1228 & n.2 (Fla. 2d DCA 2015) (noting that there is "a great degree of overlap" between the second two provisions).  Under the second and third grounds, "a misrepresentation need not be knowingly made in order for the insurer to void the policy." *Mora*, 155 So. 3d at 1227.  However, the insurer must demonstrate that: (1) the insured's

statement is a misrepresentation; (3) the statement is material; and (3) the insurer detrimentally relied on the statement. *Id.* at 1227-28.

Imperium submits the affidavit of Andrew Biggio, an underwriting director, to demonstrate materiality and detrimental reliance. (Dkt. 32-1, "Biggio Aff."). In particular, Biggio avers that, had Feldman disclosed the claims for which he is now seeking coverage, Imperium would not have issued the policy, or at the very least, would have modified the policy to include a higher premium or additional exclusions. (*Id.* at ¶ 8).

Plaintiffs argue that Imperium waived this defense by failing to plead it in the Answer and Affirmative Defenses. (*See* Dkt. 8). Plaintiffs assert that they were prejudiced by Imperium's failure to provide notice of the defense because they did not have the opportunity to pursue relevant discovery, such as obtaining underwriting guidelines and deposing underwriting witnesses to determine whether any statement on the application was material. Plaintiffs further maintain that Imperium failed to disclose Biggio as a witness under Rule 26 of the Federal Rules of Civil Procedure, and they move to strike his affidavit under Rule 37(c)(1). (Dkt. 33 at 18).

In reply, Imperium argues that Plaintiffs were aware that responses on the application were at issue because Feldman was "extensively deposed on the issue," and there is thus no prejudice. (Dkt. 41 at 9). As to Biggio's affidavit, Imperium argues that it "clearly listed as a witness a corporate representative from Imperium," and Plaintiffs failed to depose that witness. (*Id.* at 8).

In their sur-reply, Plaintiffs correctly argue that Imperium did not disclose a generic "corporate representative." Rather, Imperium disclosed a specific witness—Howard Fishbein—and described him as "a claims supervisor" with "information relating to the investigation of the underlying claims and Imperium's coverage positions with regard to said claims." (Dkt. 33-3 at 1). Plaintiffs also maintain that the questions posed to Feldman during his deposition were routine questions about the application process.

"Failure to plead an affirmative defense generally results in a waiver of that defense." *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1221-22 (11th Cir. 2012). However, a district court may consider an affirmative defense raised for the first time in a motion for summary judgment if the plaintiff fails to show prejudice. *Id.* at 1222 (citing *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir.1989)).

In this case, Plaintiffs demonstrate prejudice. Plaintiffs did not conduct discovery on the issue of materiality, such as obtaining underwriting guidelines and deposing underwriting witnesses. *See, e.g., Nationwide Mut. Fire Ins. Co. v. Kramer*, 725 So. 2d 1141, 1142 (Fla. 2d DCA 1998) (considering underwriting standards and underwriter's affidavit in assessing materiality).[9] The prejudice was compounded by Imperium's failure to disclose Biggio as a witness—a failure for which Imperium offers no explanation. Moreover, Imperium's disclosure of Fishbein as a witness did not render harmless its failure to disclose Biggio (or

---

[9] Although the undersigned has held that underwriting guidelines or underwriter testimony are not necessarily required to rule on the merits of whether a misrepresentation is material, Plaintiffs were entitled to attempt to discover information that might support an argument that the misrepresentations were *not* material. *Zurich Am. Ins. Co. v. Diamond Title of Sarasota, Inc.*, No. 8:10-cv-383, 2013 WL 6283684, at *5 (M.D. Fla. Dec. 4, 2013).

otherwise provide notice of the Section 679.409(1) defense) because Fishbein was specifically described as a claims witness, not an underwriting witness. Finally, the questioning during Feldman's deposition was largely routine and, standing alone, did not serve to give Plaintiffs notice of a Section 679.409(1) defense. (*See* Feldman Dep. at 12-22).

Based on the foregoing, the Court finds that Imperium waived its defense under Fla. Stat. § 679.409(1), and Imperium's motion for summary judgment on this ground is therefore denied. Because the Court does not reach the merits of the defense, Plaintiffs' request to strike Biggio's affidavit is denied as moot.

## D.    *Affirmative defenses*

In their partial motion for summary judgment, Plaintiffs request judgment on four of Imperium's affirmative defenses. For the reasons set forth below, the motion is granted as to Imperium's second, fourth, and fifth affirmative defense. The sixth affirmative defense is stricken, pursuant to Imperium's request.

### 1. *Second affirmative defense*

Imperium's second affirmative defense alleges that the underlying claims were not first made during the policy period, as required under the claims-made policy. (Dkt. 8 at 4). The relevant policy provision states:

> The Company shall pay on behalf of any INSURED all DAMAGES in excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against an INSURED during the POLICY PERIOD[.]

(Dkt. 27-7 at 20). The policy period is December 20, 2012 to December 20, 2013. (*Id*. at 11, 26). The policy also contains a retroactive date endorsement, providing that the policy

does not apply to claims arising from wrongful acts prior to April 12, 2010 for Gilbert and December 21, 2009 for Feldman.  (*Id*. at 15).

Plaintiffs argue that it is undisputed that Ketchum's state-court action was filed on April 12, 2013, during the policy period, and constitutes the only claim filed by Ketchum against the Plaintiffs.  (Dkt. 27-1; Dkt. 8 at ¶ 5). Plaintiffs further maintain that the alleged wrongful acts, which occurred in connection with the July 29, 2011 settlement, are also well within the retroactive dates applicable to Gilbert and Feldman.

In response, Imperium contends that the policy's definition of "claim" is not limited to the service of a lawsuit, but also includes any "demand."  Imperium maintains that "[t]he clear indications from Mr. Taylor and Mrs. Ketchum that Feldman and Mr. Gilbert had made a crucial error and the assurances from Mr. Gilbert that he would 'fix it' suggests that a demand was made upon Mr. Gilbert and Feldman to correct the mistake or pay Mr. Ketchum his benefits."  (Dkt. 31 at 3).  At the very least, Imperium asserts that there is a jury question as to whether an actual demand was made.

Imperium's argument is not persuasive.   A "claim" is defined as "a demand made upon any INSURED for DAMAGES, including, but not limited to, service suit [*sic*] or institution of any alternative dispute resolution proceedings against any INSURED."  (Dkt. 27-7 at 24).  "Damages" includes "the  monetary and compensatory portion of any judgment, award or settlement, damages also include those amounts the court is permitted to impose on a debt collector as set forth in 15 USC § 1692k(a)."  (*Id*.)  Although "demand" is not defined in the policy, Florida courts "commonly adopt the plain meaning of words contained in legal

and non-legal dictionaries." *Brill v. Indianapolis Life Ins. Co.*, 784 F.2d 1511, 1513 (11th Cir. 1986).  One dictionary definition of "demand" is "to ask for urgently or firmly, leaving no change for refusal or denial" or "to claim as just or due."  *American Heritage Dictionary* 350 (New Coll. ed. 1978).

Imperium identifies two requests that potentially constitute a "demand."  First, Gale Ketchum asked Gilbert, by email on August 15, 2011, if he ever notified Zurich of the lawsuit and if he had proof of receipt.  (Dkt. 27-2 at 77).  Second,  in reference to the loss of his workers' compensation benefits, Ketchum asked Gilbert, "can you fix this?"  (Ketchum Dep. at 16-17).  The Court will assume, *arguendo*, that both requests are sufficiently urgent or firm, or claim something due, so as to constitute a "demand."  However, there is no indication that either request was a demand "*for* DAMAGES" because neither Ketchum nor his mother requested damages as that term is defined in the policy.  Accordingly, Plaintiffs' motion for partial summary judgment is granted as to Imperium's second affirmative defense.

## 2. *Fourth affirmative defense*

Imperium's fourth affirmative defense alleges that Plaintiffs failed to comply with a policy condition requiring an insured to give prompt written notice of a claim, or to give notice within 30 days.  (Dkt. 27-7 at 30).  Plaintiffs argue that the notice was timely because the law firm was served with Ketchum's lawsuit on June 14, 2013 and Imperium was notified four days later, on June 18, 2013.  (Dkt. 28-1 at 1; Dkt. 2 at 56).

In response, Imperium adopts the arguments made in connection with its second affirmative defense, arguing that a "demand" was made when Gale Ketchum sent her August

15, 2011 email, or when Ketchum asked if the loss of benefits could be fixed. Because those events occurred well before June 18, 2013, Imperium maintains it was not provided with sufficient notice of the claim.

For the reasons stated above, there is no indication that Ketchum or his mother made a "claim" because their requests included no demand "for damages." Imperium cites no other evidence calling into question Plaintiffs' compliance with the prompt-notice condition. Plaintiffs' motion for partial summary judgment is therefore granted as to the fourth affirmative defense.

### 3. Fifth affirmative defense

In its fifth affirmative defense, Imperium asserts that "Plaintiffs' claims are barred by its failure to comply with conditions precedent, including but not limited to filing a Civil Remedy Notice of Insurers Violation prior to bringing breach of contract/bad faith action." (Dkt. 8 at 5). Plaintiffs argue that this Court, in ruling on Imperium's motion to dismiss the breach-of-contract claim, specifically rejected the argument that Plaintiffs' contract claim was effectively a bad-faith claim. (Dkt. 11). Because a civil remedy notice is a condition precedent to a bad-faith claim, and not to a breach-of-contract claim, Plaintiffs argue that their failure to file a civil remedy notice is not relevant.

In response, Imperium re-asserts the arguments raised in the earlier motion to dismiss. (Dkt. 31 at 4; *see* Dkt. 7). As this Court previously held, Plaintiffs raise no bad-faith claim, and Imperium identifies no other unfulfilled conditions precedent. Accordingly, Plaintiffs' motion for partial summary judgment is granted as to Imperium's fifth affirmative defense.

### *4. Sixth affirmative defense*

Imperium's sixth affirmative defense alleges that no equitable remedies establish coverage because equitable remedies cannot be used to create or extend coverage under an insurance policy. (Dkt. 8 at 5). Plaintiffs assert that they have not raised any equitable remedies as a basis for establishing coverage.

Imperium notes that Plaintiffs requested "such other and further relief as this court may deem just and proper," which potentially includes equitable relief. (*See* Dkt. 2 at 3-4). However, Imperium agrees that the defense is moot to the extent Plaintiffs are not seeking equitable remedies. Imperium requests that the defense be stricken for mootness.

Based on Plaintiffs' representation that they are not raising equitable remedies as a basis for establishing coverage, the sixth affirmative defense is stricken as immaterial pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

### *Conclusion*

Based on the foregoing, it is **ORDERED AND ADJUDGED** that:

(1) Defendant Imperium Insurance Company's Motion for Summary Judgment (Dkt. 27) is **DENIED**;

(2) Plaintiffs' Motion for Partial Summary Judgment (Dkt. 28) is **GRANTED** as to Defendant's second, fourth, and fifth affirmative defenses. Defendant's sixth affirmative defense is stricken.

**DONE** and **ORDERED** in Tampa, Florida on October 5, 2015.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>Copies furnished to:</u>
Counsel/Parties of Record

S:\Odd\2014\14-cv-1637 msj 27.wpd